IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:18cr194

ERIC BRIAN BROWN,

Defendant.

## *MEMORANDUM OPINION AND ORDER*

Before the Court is the Government's Motion to Involuntarily Medicate Defendant Brown To Restore His Competency to Stand Trial ("Sell Motion"). ECF No. 100. The Court held a hearing and considered the parties' filings on the matter. The Government's Sell Motion is **GRANTED** with respect to Option 2A of the Individualized Treatment Plan, but **DENIED** with respect to Option 1 and Option 2B of the Individualized Treatment Plan.

## I. FACTUAL AND PROCEDURAL HISTORY

Eric Brian Brown ("Defendant") is charged with Count 1, Kidnapping Resulting in Death, in violation of 18 U.S.C. § 1201(a)(1) and (2); Count 2, Assault with Intent to Commit Aggravated Sexual Abuse and Sexual Abuse, in violation of 18 U.S.C. § 113(a)(1); Count 3, Assault with Intent to Commit a Felony, in violation of 18 U.S.C. 113(a)(2); Count 4, Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. § 113(a)(6); Count 5, Theft of Personal Property, in violation of 18 U.S.C. § 661; and Count 6, Stalking, in violation of 18 U.S.C. § 2261A(1). ECF No. 104. On December 15, 2017, the Court ordered an examination of Defendant to determine his competency to stand trial pursuant to 18 U.S.C. § 4241(a) and Fed. R. Crim. P. 12.2(c)(1)(A). ECF No. 17. On January 23, 2018, the Court received the forensic report on the Defendant, which

informed the Court's determination that Defendant was incompetent to stand trial. ECF Nos. 20, 24. Since that time, Defendant has been committed to the custody of the Attorney General in FMC Butner in an attempt to restore his competency to stand trial. Since his admission into FMC Butner, Defendant has consistently refused all voluntary treatment and the oral administration of antipsychotic medication.

On June 22, 2018, the Court affirmed the Bureau of Prison's ("BOP") administrative determination to forcibly medicate Defendant pursuant to *Washington v. Harper*, 494 U.S. 210 (1990). ECF No. 45. Since his *Harper* hearing, Defendant has been treated under the Harper Factors. His treatment consists of the involuntarily medication of haloperidol, an antipsychotic that is administered via injection and mitigates the symptoms of Defendant's schizophrenia and catatonia enough to place him in partial remission and limit the acute risk he will harm himself or others. *See* ECF No. 94. This treatment with a single antipsychotic drug is considered a form of monotherapy. However, Defendant still suffers residual symptoms that continue to interfere with his competency to stand trial. *Id.*

On July 11, 2019, FMC Butner issued a report on the Defendant's status, indicating its recommendation that Defendant be further involuntarily medicated pursuant to *Sell v. United States*, 539 U.S. 166 (2003) for the purpose of restoring his competence to stand trial. *Id.* On August 6, 2019, the Court issued an order directing that FMC Butner prepare a Sell Appendix Report. ECF No. 98.

On September 4, 2019, FMC Butner issued its Individualized Treatment Plan for Defendant in accordance with the Court's order. ECF No. 117. The Individualized Treatment Plan contains the following conclusions: (1) Defendant suffers from schizophrenia, which is currently in partial remission; (2) Defendant's symptoms of acute danger and grave disability have been

treated with haloperidol following his *Harper* hearing; and (3) Defendant requires additional treatment to attain competency. *Id.* The Individualized Treatment Plan further proposes that Defendant be placed on a "multi-step medication plan." *Id.* The first two proposed treatments qualify as Antipsychotic Polypharmacy ("APP"), or treatment of schizophrenia using multiple antipsychotic drugs. ECF No. 117 at 10. Option 1 is an APP treatment of haloperidol by injection and aripiprazole by mouth. *Id.* Option 2A is an APP treatment of olanzapine and haloperidol by injection. *Id.* Option 2B is switching Defendant's injection monotherapy from haloperidol to fluphenazine. *Id.*

Defendant objects to the Government's Sell Motion and the parties have made numerous filings in support of their positions. ECF Nos. 103, 110, 111, 113–115. On December 10, 2019, the Court held a hearing on the Government's Sell Motion, at which time the Court heard testimony from the Government's expert, Dr. Logan Graddy ("Dr. Graddy"), and the Defendant's expert, Dr. George P. Corvin ("Dr. Corvin"). *See* ECF No. 118. Most of the dispute between the parties involves Option 2A and the merits of an involuntary APP treatment using a combination of haloperidol and olanzapine. At the conclusion of the December 10, 2019 hearing, the Court ordered supplemental briefings on the Sell Motion from the parties. *Id.* The matter is now fully briefed (ECF Nos. 120, 121) and the Sell Motion is ripe for determination.

## II. LEGAL STANDARD

Through a series of cases, the United States Supreme Court ("Supreme Court") has established a framework to determine whether the "forced administration of antipsychotic drugs to render [a criminal defendant] competent to stand trial unconstitutionally deprives [the defendant] of [their] 'liberty' to reject medical treatment." *Sell v. United States*, 539 U.S. 166, 177 (2003). In *United States v. Harper*, 494 U.S. 210 (1990), the Supreme Court "recognized that an

individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Id.* at 178 (quoting *Harper*, 494 U.S. at 221). However, the Supreme Court also found that "the State's interest in administering medication was legitimate and important, and it held that the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* (internal quotations and citations omitted). As the Supreme Court summarized in *Sell*, its decision in *United States v. Riggins*, 504 U.S. 127 (1992) recognizes, "that, in principle, forced medication in order to render a defendant competent to stand trial for murder was constitutionally permissible." *Id.* at 179. Considered together:

> These two cases, *Harper* and *Riggins*, indicate that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Id.* The Supreme Court has made clear that the circumstances justifying the intrusion of the liberty of an individual person implicit in the act of forcibility medicating a criminal defendant are "rare." *Id.*

In order to justify forcibly medicating a criminal defendant to achieve competency for trial, a district court must make a series of findings with respect to four factors identified by the Supreme Court in *Sell* ("Sell Factors") as well as consider relevant special circumstances. Further, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has provided the following guidance for district courts in applying the Sell Factors:

> Because the involuntary administration of antipsychotic drugs for purposes of trial competence implicates both a person's significant liberty interest in avoiding

4

unwanted drugs and the public's interest in prosecuting crimes, a higher standard of proof for entry of such an order is desirable. A higher standard—a standard greater than the preponderance-of-the-evidence standard but not as demanding as the beyond-a-reasonable-doubt standard—minimizes the risk of erroneous decisions in this important context.

*United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009) (internal citation omitted). Therefore, the Court must find that the Sell Factors weigh in favor of the Government by clear and convincing evidence. *Id.*

**A. Sell Factors**

In order to forcibly medicate a defendant to restore competency to stand trial, the Government must establish the following, by clear and convincing evidence: (1) that an important governmental interest exists, such as bringing a defendant to trial who is charged with a serious crime; (2) that involuntary medication will significantly further the Government's interest; (3) that involuntary medication is necessary to further the Government's interest, as less intrusive means of restoring competency are unlikely to be successful; and (4) that the use of any medicines are medically appropriate in light of the defendant's condition. *Sell*, 539 U.S. at 179.

1. *Important Governmental Interest*

A court contemplating forcibly medicating a defendant must "find that important governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property." *Sell*, 539 U.S. at 180. The Fourth Circuit has further elaborated on what constitutes a serious crime for the purpose of Sell Factors analysis, holding that "the central consideration when determining whether a particular crime is serious enough to satisfy this factor is the 'maximum penalty authorized by statute.'" *United States v. Chatmon*, 718 F.3d 369, 374 (4th Cir. 2013) (citing *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005)). In

*United States v. White*, the Fourth Circuit found that "[w]ithout establishing a hard and fast rule, we have held that a crime is 'serious' for involuntary medication purposes where the defendant faced a ten-year maximum sentence for the charges against him." *United States v. White*, 620 F.3d 401, 410 (4th Cir. 2010). However, the Fourth Circuit also discussed and did not "flatly reject[]" a guidelines sentencing approach as an alternative means to determining whether a crime is serious. *White*, 620 F.3d at 411 n.7. Even using a guidelines sentencing approach, the Fourth Circuit still cautions that regardless of how much time a defendant actually would spend in prison, if convicted, "[t]here are other aspects to the government's interest that make it important to bring [defendants] to trial for the alleged criminal conduct," including conveying to the public the serious nature of the alleged conduct. *Bush*, 585 F.3d at 815 (internal citation omitted). However, the Fourth Circuit has tempered this view in more recent cases:

> In *Bush*, we also explained that 'the very fact that the government is prosecuting Bush for this conduct conveys a message about its seriousness and its consequences.' Although this is true, it is not a unique characteristic in this case, nor could it ever be a unique characteristic of any case of this type. It is instead a truism, applicable to any case where the government seeks forcible medication: without a prosecution, there would be no case.

*White*, 620 F.3d at 413 (internal citation omitted).

In determining whether a crime is serious, the Supreme Court also direct district courts to consider special circumstances that "may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180. The *Sell* Court also cites as a special circumstance the amount of time the defendant has already spent in custody and the time served that would be credited if convicted. *Id.* However, the Court has also made clear that by directing consideration of special circumstances:

> We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, *see* 18 U.S.C. § 3585(b)). Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

*Id.*

Additionally, the Fourth Circuit has clarified that the two enumerated special circumstances in *Sell* do not constitute the full compendium of circumstances district courts can or should consider:

> We reject the government's implied assertion that our special circumstances analysis is limited to considering whether White is subject to civil commitment and whether she has been confined for a significant period of time. In *Sell*, the Supreme Court clearly stated that the inquiry is a fact-specific one: "[c]ourts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. The Court then provided a non-exclusive list, as evidenced by its use of the term "for example" in the sentence immediately following its announcement that special circumstances may lessen the government's interest. *Id.* Further, we have already recognized the flexible nature of our special circumstances inquiry in *Evans*, where we explicitly stated that length of incarceration is not necessarily the only factor relevant to whether special circumstances undermine the government's interest.

*White*, 620 F.3d at 412 n.9. As the Fourth Circuit references above, the special circumstances articulated in *Sell* are not "the only consideration relevant to whether special circumstances undermine the government's interest." *Evans*, 404 F.3d at 240. Therefore, "the flexibility of the special circumstances determination may identify factors militating in favor of the government's interest in going forward with a prosecution even where there has been prolonged pretrial detention, and the analysis may also identify factors further undermining the government's interest." *White*, 620 F.3d at 413. With this in mind, "the district court [having] the option of

7

imposing a period of supervised release as a factor bolstering the government's interest." *Id.*

2. *Involuntary Medication Must Significantly Further the Government's Interest*

A court contemplating forcibly medicating a defendant must also find that the administration of said medication will significantly further the Government's interest. As the Supreme Court explains:

> [The district] court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

*Sell*, 539 U.S. at 181.

3. *Involuntary Medication Must Be Necessary to Further the Government's Interest*

A court contemplating forcibly medicating a defendant must also find that forcibly medicating a defendant is necessary to further the Government's interest:

> [The district] court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. *Cf.* Brief for American Psychological Association as *Amicus Curiae* 10–14 (nondrug therapies may be effective in restoring psychotic defendants to competence); but *cf.* Brief for American Psychiatric Association et al. as *Amici Curiae* 13–22 (alternative treatments for psychosis commonly not as effective as medication). And the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods.

*Id. Sell* has a "specific command that must be met before a district court may answer this inquiry in the affirmative: the court 'must consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power.'" *United States v. Chatmon*, 718 F.3d 369, 375 (4th Cir. 2013).

*4. Use Of Drugs Is Medically Appropriate In Light Of The Defendant's Condition*

Finally, a court contemplating forcibly medicating a defendant to restore competency must also find the usage of drugs is medically appropriate:

> [The district] must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.

*Sell*, 539 U.S. at 181. With these legal standards in mind, the Court now addresses the Government's Sell Motion.

### III. DISCUSSION

After hearing the arguments of the parties and reviewing their filings, the Court finds that that Option 1 (an APP treatment requiring oral administration of aripiprazole) of the Individualized Treatment Plan is unlikely to be successful due to Defendant's consistent refusal to take oral medication voluntarily. Therefore, the Court must consider the efficacy of Option 2A (injection APP using haloperidol and olanzapine) and Option 2B (injection monotherapy using fluphenazine). For the following reasons, the Court finds that the Government has met its burden on each of the Sell Factors by clear and convincing evidence with Option 2A, but not Option 2B. Therefore, Defendant may be medicated in accordance with Option 2A. If Option 2A fails, the Government must present more evidence of the efficacy of Option 2B if it wishes to attempt to restore Defendant to competency using fluphenazine.

**A. The Government Has Established an Important Interest**

The Government easily meets its burden under the first Sell Factor. Defendant is charged with six different crimes, the most serious of which is Kidnapping Resulting in Death. If convicted, Defendant faces life imprisonment for the offenses charged. Quite simply, the charges at issue in

this case are among the most serious in federal criminal law. It follows that the Government's interests in prosecuting a case with such serious implications—both in terms of the nature of the crime itself and the penalties associated with a conviction—are elevated to an extremely high degree.

The Court must also consider any special circumstances that mitigate the Government's elevated interest in prosecuting this case. The Court has previously recognized that the special circumstances of some cases—including the availability of civil commitment—mitigate the Government's interest in pursuing a prosecution. *See United States v. Duncan*, 968 F. Supp. 2d 753 (E.D. Va. 2013) (holding the Government's interest in prosecuting a defendant for unlawful possession of a firearm was not serious enough to justify involuntary medication under *Sell*). However, the availability of civil commitment does not come close to overcoming the Government's interests in prosecuting this specific case against the Defendant, namely protecting public safety and deterring similar crimes. Quite simply, civil commitment cannot stand in place of a criminal prosecution in such a serious case when a viable plan for restoring the Defendant's competence has been developed in accordance with the Sell Factors. In other words, simply allowing the Defendant to languish below competence so that he may be civilly committed does not satisfy the Government's interests in timely prosecuting the crimes for which Defendant is accused—most notably, Kidnapping Resulting in Death. Therefore, the first Sell Factor is satisfied.

### B. Involuntary Medication with Option 2A Will Substantially Further the Important Governmental Interest

The parties disagree on whether the Government has met its burden with respect to the second Sell Factor. For the following reasons, the Court concludes that Option 2A of the Government's Individualized Treatment Plan is substantially likely to restore Defendant's competency without side effects that will interfere with his assistance in his defense. However, the

Government has not presented sufficient evidence to support a finding that Option 2B is significantly likely to restore Defendant to competency at this time.

1. *Option 2A is Substantially Likely to Restore Defendant to Competency*

As an initial matter, it is clear that Defendant's condition has improved with haloperidol monotherapy, despite the fact that he has not been restored to competency on a consistent and prolonged basis. Tr. 21:10–20. Additionally, Dr. Corvin conceded that some alternative form of treatment has the potential to restore him to competency, opining that the likelihood of Defendant achieving competency would improve "if [Defendant] were on a medication that has superior efficacy." Tr. 220:4–6. Currently, Defendant is being treated with a low dose of haloperidol and the medication has a small presence in his bloodstream, leading Dr. Graddy to refer to the current treatment as a "maintenance medication" unlikely to restore Defendant to competency. Tr. 25:17; 24–25:18–4. This supports the conclusions that Defendant's schizophrenia has not been fully treated and he should not be considered as a patient unlikely to be restored based on unsuccessful antipsychotic treatment administered over 120 days. *See also* Tr. 45–46:25–6 (describing the "partial remission" achieved by the "incomplete[] treatment" on haloperidol). The Court views the foregoing as an indication that treatment with haloperidol has achieved a degree of effectiveness and further treatment is capable of restoring Defendant to competency, rather than a dispositive signal that Defendant's incompetence is intractable just because he has been treated with haloperidol in accordance with the Harper Factors.

Notwithstanding Dr. Corvin's reservations about utilizing APP on an involuntary basis, APP's role in treating schizophrenia is supported by data accumulated in the Tiihonen Study.[1] The Tiihonen Study finds that APP is "associated with slightly lower risk of psychiatric

---

[1] Jari Tiihonen, et al., *Association of Antipsychotic Polypharmacy vs. Monotherapy with Psychiatric Rehospitalization Among Adults with Schizophrenia*, 76 JAMA PSYCHIATRY 499 (2019).

11

rehospitalization than monotherapy." ECF No. 113-3 at 2. While psychiatric rehospitalization does not neatly equate with competency restoration, the Tiihonen Study does show that APP can be a safe and effective treatment for schizophrenia bringing benefits that outweigh the side effects. Moreover, it is clear that a treatment of "superior efficacy" is required for Defendant. Dr. Graddy also has experience treating patients using APP, including the successful use of the combination of haloperidol and olanzapine proposed in Option 2A. Tr. 52:16–22 (describing the combination of haloperidol and olanzapine as "completely necessary" for one patient in FMC Butner). The Court considers the APP proposed in Option 2A a viable path forward, given its demonstrable results documented in the Tiihonen Study and Dr. Graddy's clinical experience, as well as Defendant's refusal to be treated with oral medication and/or therapy.

The Individualized Treatment Plan and Dr. Graddy's testimony demonstrated a significant likelihood that Defendant will be restored to competency using Option 2A with the following representations. As an initial matter, the Individualized Treatment Plan shows a substantial likelihood that Defendant's delusions will be successfully treated using the Cochrane Study.[2] ECF No. 113-1. This study shows that 76% of defendants treated with antipsychotic medication were restored to competency status with involuntary treatment. ECF No. 117-1 at 2. Specific to the concern regarding Defendant's delusions, 73.3% of defendants facing this issue were restored to competency. *Id.* Most convincingly, all five defendants in the Cochrane Study who were administered an involuntary APP regimen in accordance with the Sell Factors were restored to competency. Tr. 53–54:12–8. In sum, the Individualized Treatment plan shows that, as a general matter, defendants with schizophrenia and the accompanying delusions are likely to be restored to competency when properly treated in accordance with the Sell Factors.

---

[2] Robert E. Cochrane, et al., *The Sell Effect: Involuntary Medication Treatment Is a Clear and Convincing Success*, 37 L. HUM. BEHAV. 107 (2013).

Specific to the Defendant, Dr. Graddy demonstrated that Option 2A is substantially likely to restore him to competency by considering his past and current treatment, as well as his specific symptoms and provides a recommended starting dosage of 10 mg of olanzapine in combination with his current dosage of 100 mg of haloperidol. Tr. 48:22–25. Dr. Graddy also successfully demonstrated that Defendant is an appropriate candidate for APP treatment in accordance with Option 2A by (1) appropriately comparing Defendant to patients who have not yet been fully treated with antipsychotic medication; (2) demonstrating the overall efficacy of APP treatments; (3) drawing on his experience of treating other patients with a combination of haloperidol and olanzapine; and (4) linking Defendant's current condition to other cases successfully treated with APP. Dr. Graddy's individualized evaluation of Defendant considers the current symptoms of his mental illness, along with his medical records and past treatments before concluding that the addition of olanzapine will restore Defendant to competency. In sum, Dr. Graddy's testimony regarding his evaluation of the Defendant's characteristics and his experience and research on APP supports the conclusion that Defendant is a suitable patient for the APP regimen proposed in Option 2A. *See United States v. Abney*, 760 F. App'x 171, 174 (4th Cir. 2019) (affirming the use of involuntary medication where the Government's expert presented sufficient research into the particularities of the defendant's symptoms, disease, and potential side effects).

Sedation and mental functioning are the primary side effects that may interfere with Defendant's ability to assist in his defense. *See* Tr. 50:19–24; 60:6–13. However, Dr. Graddy accounted for these issues by testifying that (1) sedation caused by a dose of olanzapine would not be any worse than the sedation the Defendant is currently experiencing with haloperidol, which causes Defendant to sleep about 16 hours per day; (2) the medication would be administered in the evening before bed, allowing Defendant to participate in proceedings and assist with his defense

during the appropriate hours; and (3) Defendant's mental functioning has already improved with the use of haloperidol and would further improve with more effective treatment. Tr. 50:19–24; 60:6–13; 136:9–15. Further, the Court finds that the current haloperidol treatment is not substantially interfering with Defendant's memory and the addition of olanzapine to his treatment will not cause memory issues. *See* Tr. 22–23:13–16 (describing Defendant's ability to remember his childhood, federal service, and details of football games after he became mentally ill). Therefore, the Court is satisfied that Defendant will not experience side effects that may render him unable to assist in his own defense. Moreover, Defendant will be monitored for side effects at all points during treatment under Option 2A. Other potential side effects relevant to the fourth Sell Factor will be addressed later in this Order.

The Court concludes that the Individualized Treatment Plan and Dr. Graddy's testimony have demonstrated (1) the limited purpose and effects of the haloperidol monotherapy, given the Defendant's condition; (2) the advantages of additional treatment using Option 2A that show a substantial likelihood that Defendant's competency will be restored; and (3) consideration of the potential side effects of Option 2A and the unlikelihood they will interfere with Defendant's assistance in his defense.

The Court is unpersuaded by Defendant's objections to Option 2A on the grounds that the Government has not met its burden under the second Sell Factor. Defense counsel argues that because Defendant has not been restored to competency during the period Defendant has been treated pursuant to his *Harper* hearing, there is no treatment plan that is substantially likely to restore Defendant to competency relative to the Sell Factors. In practical terms, defense counsel's argument is that because Defendant has been treated with haloperidol monotherapy for more than 120 days, he has already been treated in accordance with the Sell Factors *and* there is no substantial

likelihood of competency restoration, regardless of the treatment used. *See* ECF No. 120 at 3–6 (asserting that as a general matter, there is only a 37% chance of competency restoration after 120 days of treatment with antipsychotics). The implication of defense counsel's argument is that the Court is categorically unable to order competency restoration measures more than 120 days after a defendant has begun any antipsychotic treatment regimen. Defense counsel's position also ignores the distinction between treating Defendant under the Harper Factors as opposed to the Sell Factors and overlooks the potential effectiveness of new treatment plans, given the individualized characteristics of each defendant and the circumstances of their treatment.

Additionally, the Court notes that the purpose of the Sell Factors is to determine when it is appropriate to medicate a defendant on an involuntary basis in order to restore his or her competency. Once again, the Court cannot accept the contention that the Court is prohibited from ever utilizing APP in the *Sell* context because Tiihonen study is the "first of its kind," despite evidence that APP treatment is appropriate in some cases. ECF No. 120 at 8–10. Additionally, even Dr. Corvin conceded "there is a [limited] role for [APP] in clinical practice" (Tr. 191:8–16), in contrast to the contention that the prevailing standard of practice categorically prohibits the use of APP in the *Sell* context. Ultimately, the Court is persuaded that Dr. Graddy has provided adequate justification for Option 2A, based on his consideration of the relevant data and the condition of the Defendant. Therefore, the second Sell Factor is satisfied under Option 2A.

> 2. *The Government has not Presented Adequate Justification to Support the Conclusion that Option 2B is Substantially Likely to Restore Defendant to Competency*

At the hearing, Dr. Graddy testified that, although the fluphenazine monotherapy proposed in Option 2B is not exactly the same as the current haloperidol monotherapy, it is very similar and "would be a less beneficial treatment." Tr. 47:4–23. Further, Dr. Graddy's only justification for treatment using fluphenazine rather than haloperidol was that "perhaps we will be able to get to a

higher dose" without side effects such that Defendant's schizophrenia will be fully treated. Tr. 47:19–23. Given the similarities between fluphenazine and haloperidol and Dr. Graddy's recommendation that the current dosage of haloperidol should not be increased, the Court is unable to conclude that fluphenazine is any more likely to restore Defendant to competency than his current haloperidol monotherapy, which Dr. Corvin and Dr. Graddy both agree is unlikely to restore Defendant to competency.[3]

If Option 2A fails, the Government may attempt to provide additional evidence on the efficacy of Option 2B. More specifically, the Government will have to demonstrate that Defendant will be able to tolerate a higher dose of fluphenazine relative to his current dose of haloperidol. However, given the testimony of both experts and the conceded similarities of fluphenazine and haloperidol, the Court believes it is likely that Option 2B will provide similar benefits and side effects as compared to Defendant's current treatment. Accordingly, the Government has failed to show that Option 2B satisfies the second Sell Factor by clear and convincing evidence.

### C. Involuntary Medication Is Necessary to Further the Government's Interest

The third Sell Factor is easily satisfied, given the fact that the Defendant has not been restored to competence on a consistent basis since the Court initially ordered his psychiatric examination on December 15, 2017 and he has refused treatment since that time. ECF No. 17. Implicit in Defendant's conclusion that civil commitment is an appropriate remedy in lieu of prosecution, coupled with the argument that *none* of the treatment options proposed in the Individualized Treatment Plan will be effective demonstrates the unlikelihood that Defendant will be restored to competency absent a change in his current treatment plan consisting of haloperidol

---

[3] The Individualized Treatment Plan states "I do not recommend further increases in dosage of haloperidol" and specifically references fluphenazine as an antipsychotic that "act[s] in a similar manner and has similar side effects." ECF No. 117 at 9. The Government has not provided any explanation as to why Defendant is any more likely to tolerate a higher dosage of fluphenazine relative to haloperidol given their similarities.

monotherapy.

The Court understands that the burden is on the Government to prove each of the Sell Factors by clear and convincing evidence, necessarily exempting Defendant from proposing some alternative treatment plan to restore competency. However, the implication that there is some unconsidered and less intrusive therapy that will restore Defendant to competency over two years after his first psychiatric exam was ordered ignores both the inherent complexity of Defendant's mental illness and the Government's interest in considering an effective alternative therapy. Stated another way, the Court concludes that if there was some easier and less intrusive way to treat Defendant pursuant to the Harper Factors or the Sell Factors, it would have been proposed and adopted before now. Moreover, the possibility that Defendant is more likely to be restored to competency through some less intrusive treatment is not supported by his unwillingness to submit to any other form of treatment, including oral medication and therapy. ECF No. 121 at 12. In sum, the Court views the involuntary administration of different antipsychotic medication as essential for competency restoration. Therefore, the third Sell Factor is satisfied.

**D. Involuntary Medication is Medically Appropriate In Light of the Defendant's Condition**

The parties also disagree on the medical appropriateness of the Individualized Treatment Plan. In order to properly consider whether Option 2A of the Individualized Treatment Plan is medically appropriate, the Court must consider the context of the Defendant's current condition and the benefits that may be attained with more effective treatment of his schizophrenia. *See United States v. Mackey*, 717 F.3d 569, 576 (8th Cir. 2013) (finding uncontroverted evidence that defendant's quality of life would improve with involuntary medication as dispositive with regard to the fourth Sell Factor).

At this stage in his treatment, Defendant is subsisting below competency and experiences

delusions based on a schizophrenia that is only partially treated. *See* Tr. 79:10–14; 95:24; 96:2–3; *See also* ECF No. 117 at 3 (diagnosing Defendant with schizophrenia in partial remission and recommending further treatment in accordance with the Sell Factors). The parties agree that leaving Defendant's schizophrenia untreated would not be medically appropriate. Similarly, the Court finds that leaving Defendant's schizophrenia only partially treated with haloperidol such that he continues to experience delusions is also medically inappropriate when there is a viable treatment available. In other words, while the efficacy of any medical treatment must be balanced against potential side effects, the Court rejects the contention that allowing Defendant to languish in a state of controlled delusion is in his best medical interest. Because Dr. Graddy has demonstrated that Option 2A offers a substantial likelihood that the symptoms of Defendant's schizophrenia will abate and Defendant will be restored to competency, the Court must consider whether such a benefit is outweighed by the risks posed by potential side effects.

The Court understands that there is some risk the introduction of olanzapine into Defendant's treatment will cause the him to experience side effects, particularly elevated liver enzymes. When Defendant was treated and taken off olanzapine in 2000, he was also taking chlorpromazine, an antipsychotic medication also known to cause liver problems. Tr. 42:5–7. Although Defendant's medical record contains a notation that olanzapine was the likely cause of Defendant's elevated liver enzymes (Tr. 42:13–15), olanzapine rarely causes liver problems in the general population and there is some question as to what caused the Defendant's elevated liver enzymes at that time. Tr. 42:5–12; 43:17–19. In contrast with Defendant's treatment with olanzapine in 2000, the Individualized Treatment Plan calls for careful monitoring of all side effects (including elevated liver enzymes) by a team of doctors, including a gastroenterologist in an inpatient setting. The Individualized Treatment Plan also considers and accounts for other more

serious side effects that are less likely to occur. Tr. 47–52:24–13 (discussing the risk of elevated liver enzymes, along with the side effect of sedation and the small possibility that severe complications from injecting antipsychotics will occur); *See also* ECF No. 117-1 at 4–7 (discussing the monitoring and management of neuromuscular and metabolic side effects, the risk of rare but dangerous side effects, and special considerations for a treatment plan in the BOP).

In sum, the Court concludes that the likelihood that Option 2A will relieve Defendant's delusions and restore him to competency outweighs the risks of the side effects that Dr. Graddy has considered and that will be closely monitored after treatment with olanzapine begins, consistent with the Individualized Treatment Plan. Moreover, defense counsel has not refuted the Government's showing that allowing Defendant to remain incompetent and delusional as a result of his partially treated schizophrenia is not in his best medical interest when a treatment option that has a substantial likelihood to treat the symptoms of his schizophrenia and restore him to competency is available, notwithstanding the potential side effects. Accordingly, the fourth Sell Factor is satisfied.

## IV. CONCLUSION

Given the Defendant's state of mind, the Court concludes that Defendant is not competent to comply with a Court order to take medication or voluntarily agree to an Individualized Treatment Plan. For the foregoing reasons, the Government's Sell Motion is **GRANTED** with respect to Option 2A, but **DENIED** as to Options 1 and 2B of the Individualized Treatment Plan.

The Court **DIRECTS** the Clerk to provide copies of this Order to Defendant's Counsel of record, the United States Attorney, and the Federal Bureau of Prisons.

**IT IS SO ORDERED.**

Norfolk, Virginia
December 23, 2019

Raymond A. Jackson
United States District Judge

19